IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| MOORECARE AMBULANCE SERVICE, LLC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:09-0078 |
| ) | Judge Trauger |
| THE DEPARTMENT OF HEALTH AND HUMAN ) | |
| SERVICES and KATHLEEN SEBELIUS, in her ) | |
| official capacity as Secretary/Director of D.H.H.S. ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM

The parties have now completed court-ordered supplemental briefing (Docket Nos. 24-26) on the plaintiff's Motion for Summary Judgment (Docket No. 18). In its present form, this briefing concerns whether the plaintiff's ambulance transports for 14 Medicare beneficiaries were properly payable by the defendants. (See Docket Nos. 25-26.) As the court finds in favor of the plaintiff on most, but not all, of these claims, the plaintiff's Motion for Summary Judgment will be granted in part and denied in part.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

The court provided the factual background of this case in its March 4, 2011 Memorandum and Order that directed further briefing. Therein, the court stated:

> The plaintiff, MooreCare Ambulance Service, LLC, is an ambulance service with its principal office in Lawrenceburg, Tennessee. The defendants are the Department of Health and Human Services (DHHS) and its Secretary, Kathleen Sebelius, who is sued in her official capacity. The DHHS is the department within the federal government responsible for the administration of the Medicare program.

1

MooreCare provided ambulance services to Medicare beneficiaries, including transporting chronically/terminally ill patients from nursing homes to treatment centers, such as renal care facilities. Following each ride, MooreCare submitted a claim to the relevant Medicare Carrier (CIGNA) for the service, and, after reviewing the submission, CIGNA paid the claim.

In May 2007, AdvanceMed, which contracts with Medicare to "safeguard" Medicare from abuse, "requested all medical records and supporting documentation" from MooreCare "that supports the billing of claims for dates of service January 1, 2005 through September 30, 2006." After receiving those materials, AdvanceMed reviewed a "random sample of [60] claims" and found a "high level of payment error." Specifically, in 89.32 percent of the claims examined, AdvanceMed found that Medicare was improperly billed for the ambulance service. On the claims specifically reviewed, AdvancedMed determined that Medicare had been overbilled in the total amount of $19,131.59. AdvanceMed extrapolated this finding across all claims submitted to Medicare during this period and determined that Medicare had overpaid the plaintiff $2,114,613.00.

Through the standard administrative appeals process that is established by statute and regulation, MooreCare appealed, first seeking a "redetermination," which is a *de novo* review by the Medicare Carrier, CIGNA. CIGNA determined that the "assessed overpayment" decision by AdvanceMed was "fully valid" and affirmed the overpayment amount. . . . [T]he plaintiff then appealed to the Qualified Independent Contractor (QIC), Q2 Administrators, which was hired by Medicare to make an "independent decision" regarding the dispute. The QIC issued a "partially favorable" ruling to the plaintiff, finding that the "actual overpayment amount can be reduced from $19,131.59 to $11,170.33." The plaintiff then appealed this ruling to the Administrative Law Judge.

In his decision, the ALJ reviewed 23 claims that had been found to be not properly payable and reversed this decision as to 13 claims. The plaintiff then appealed to the Medicare Appeals Council (MAC), which is the highest level of administrative review and whose decisions embody the final conclusions of the Secretary. In a September 4, 2009 opinion, the MAC conducted a review of all 23 claims that had been reviewed by the ALJ. The MAC affirmed some findings but also reversed several that had been favorable to the plaintiff.

The central issue before the MAC was whether the plaintiff had provided sufficient evidence that the ambulance trips under review were medically necessary, which is largely concerned with whether all other forms of transport, such as a wheelchair van, were contraindicated. The plaintiff largely relied on Physician Certification Statements (PCS) from the patient's physician that stated that the patient could only safely travel by ambulance and "run reports," which are the plaintiff's report of the details of each trip.

2

> Relying on its interpretation of the Code of Federal Regulations and the Medicare Benefit Policy Manual (MBPM), the MAC concluded that "a signed physician's certification alone is insufficient to support Medicare coverage." The MAC then went on to examine each claim and whether the record supported the use of an ambulance. The MAC found that, in 20 cases, the claim was not properly covered by Medicare, usually because the necessity of an ambulance had not been clearly demonstrated by the record.

(Docket No. 24 at 1-4)(internal citations omitted)

On November 6, 2009, the plaintiff filed its Complaint and, as noted above, on November 1, 2010, the plaintiff moved for summary judgment, seeking reversal of the MAC's decision and "adjustment" of the overpayment. (Docket No. 18 Ex. 1 at 18.) In ruling on that motion, the court found that the plaintiff had only one "potentially viable argument," which is that "under the relevant federal regulations," the claims at issue "were properly billed to Medicare." (Docket No. 24 at 4-5.) The court rejected as "unavailing" a series of other arguments advanced by the plaintiff, which largely challenged the conduct of various entities during the investigation, claim review, and appeals process. (*Id.*) The court also recognized that "the plaintiff [] argues that there is no continuing basis for extrapolation, because the 'high rate of error,' initially used to justify extrapolation under the relevant regulations, no longer exists." (*Id.* at 5.) The court left this issue for another day, after it was clear "how many of the sample claims were actually valid." (*Id.*)

The court then attempted to determine which of the claims at issue were properly billed to Medicare. The court recognized that there is a "basic" rule governing whether ambulance services are covered by Medicare laid out in the statute, and then the regulations provide further guidance with a "general" rule and a "special" rule. (*Id.* at 5-6.) The "basic" rule is that ambulance services are covered "where the use of other methods of transportation is

contraindicated by the individual's condition, but . . . only to the extent provided in regulations."

42 U.S.C. § 1395x(s)(7). The general rule found in 42 C.F.R. § 410.40(d)(1) states:

> Medicare covers ambulance services . . . only if they are furnished to a beneficiary whose medical condition is such that other means of transportation are contraindicated. The beneficiary's condition must require both the ambulance transportation itself and the level of service provided in order for the billed service to be considered medically necessary. Non-emergency transportation via ambulance is appropriate if either: the beneficiary is bed-confined, and it is documented that the beneficiary's condition is such that other methods of transportation are contraindicated; or, if his or her medical condition, regardless of bed confinement, is such that transportation by ambulance is medically required. Thus, bed confinement . . . is one factor that is considered in medical necessity determinations.

The regulation then goes on to list three prerequisites of bed confinement – that is, inability to sit in a chair or wheelchair, inability to ambulate, and inability to get up from bed without assistance. *Id*.

And, finally, the "special rule" exists for "nonemergency, scheduled, repetitive ambulance services." 42 C.F.R. § 410.40(d)(2). Under this rule, "Medicare covers medically necessary nonemergency, scheduled, repetitive ambulance services if the ambulance provider or supplier, before furnishing the service to the beneficiary, obtains a written order from the beneficiary's attending physician certifying that the medical necessity requirements of paragraph (d)(1) of this section are met. The physician's order must be dated no earlier than 60 days before the date the service is furnished." *Id.*

In the initial round of summary judgment briefing, the parties disputed whether a timely PCS and evidence of "nonemergency, scheduled, repetitive ambulance services" was sufficient for coverage under Medicare. (Docket No. 24 at 6.) The court "agree[d] with the plaintiff's interpretation of the regulation." (*Id.*) That is, "where the service is 'scheduled' and 'repetitive'

4

and the 'doctor's note' is sufficient, additional review of the record to determine medical necessity is not called for under the regulations." (*Id.*)

The court then ordered supplemental briefing in light of these findings. The court directed the plaintiff to point to evidence in the Administrative Record (A.R.) showing – for each challenged claim – that the service at issue was "scheduled and repetitive" and that a valid PCS existed. (*Id*. at 7.) Where such evidence was lacking, the court stated that "the plaintiff should proceed under the general rule and, for each claim, demonstrate that the MAC erred in finding that the ambulance service was contraindicated." *(Id.)* Citing specific examples, the court raised "serious concerns" about the MAC opinion, including that it ignored the special rule "and, at times, its opinion on the necessity [or lack thereof] of the ambulance service appears unsupported." (*Id.*)

## ANALYSIS

The parties have now provided supplemental briefing as ordered by the court. The court will discuss each beneficiary in turn.

**I.     Standard of Review**

Under the Medicare Act, the court's review of the Secretary's decision is limited to whether the decision comports with applicable law and its findings of fact are supported by substantial evidence. *Brainard v. Secretary of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). In the March 4, 2011 Memorandum, the court, in essence, found that the MAC's failure to recognize and apply the "special rule" did not comport with applicable law. Therefore,

for claims advanced under the "special rule" here, the MAC decision is of no moment. For claims advanced under the general rule, the court is guided by the substantial evidence standard, and the court will consider whether there was "such relevant evidence as a reasonable mind might accept as adequate" for the MAC decision as to each "general rule" claim. *Id.*

## II. Individual Claims

### A. D.B.

The claim at issue concerns a June 19, 2006 ambulance trip to a renal care clinic for dialysis treatment, and the plaintiff maintains that this trip falls under the "special rule." (Docket No. 25 at 2.) As support from the administrative record, the plaintiff points out that D.B.'s claim was denied by AdvanceMed under "denial code #6," (A.R. 293) which is AdvanceMed's code indicating that the claim was denied under the "special rule," for lack of a timely and valid PCS. (A.R. at 319.) This denial code, the plaintiff argues, shows that the service was "scheduled and repetitive," but the claim was denied for an insufficient PCS. (Docket No. 25 at 2.) The plaintiff then points to a signed PCS dated May 18, 2006 (that is, within 60 days prior to the trip at issue) stating that D.B. met some of the conditions of bed confinement and attesting that the "ambulance transportation is medically necessary." (A.R. at 410.)

The defendants argue that there is generally insufficient evidence in the record that the ambulance service was "repetitive," which under the defendant's guidelines, is an ambulance transport "furnished three or more times during a ten day period or once a week for three weeks." (Docket No. 26 at 4.) The defendants concede that dialysis is an example of such a "repetitive" treatment, but they still urge that the record must demonstrate repetitiveness before a

6

claim is payable, and "the plaintiff did not point to any evidence in the administrative record regarding the number of ambulance transports provided to each beneficiary."[1]  (*Id.*)

The defendants' demands on the plaintiff are unreasonable.  There is a timely PCS in the record affirming the medical necessity of the ambulance trip, and there is no indication from the record that the trip was not scheduled and "repetitive," given that it was for dialysis treatment and AdvanceMed implicitly recognized that the claim was for scheduled and repetitive treatment.  The defendants' proposed additional requirements on the plaintiff in order to receive payment are not supported by the statute or the regulations.  The court therefore finds that this claim is valid under the "special rule."

B.      C.F. (also referred to as C.W.)

The claim at issue concerns an August 29, 2005 trip, and the plaintiff invokes the "special rule."  (Docket No. 25 at 2.)  The plaintiff provides a (timely) August 2, 2005 PCS that, as above, attests to the medical necessity of ambulance transport, and the plaintiff again points to AdvanceMed's use of "denial code 6" to deny the claim. (Docket No. 25 at 2; A.R. 173, 295.)  It is also worth noting that the run report from the trip states that C.F. was transported to her

---

[1] The defendants then launch into a lengthy discussion that, in essence, argues for a different interpretation of the "special rule."  (Docket No. 26 at 4-7.)  The court did not invite supplemental briefing on this settled issue.  Also, the plaintiff apparently misunderstood the court's direction in the March 4, 2011 Memorandum and Order to explain why the MAC's decision was incorrect "in any case where the MAC reached its decision based upon a technical or procedural issue," that is, where the decision did not rest on an application of the "general rule." (Docket No. 24 at 8.)  Indeed, the plaintiff uses this instruction as a basis to discuss matters already ruled upon by the court concerning the MAC's authority to review the ALJ decision before moving on to list the claims it is challenging under the "general rule."  (Docket No. 25 at 3-4.)

"routine dialysis." (A.R. at 448.)

The defendants' only specific challenge to the evidence supporting the plaintiff's "special rule" claim here is that the PCS states that C.F. will be transported to "Baptist," while the run report states that she was taken to "Renal Care Group." (Docket No. 26 at 8.) Again, there is every suggestion from the record that C.F.'s trip was scheduled and repetitive, and there is a timely PCS in the record declaring the medical necessity of ambulance use. The court fails to see the relevance of the "Baptist" versus "Renal Care Group" issue for purposes of the "special rule." The court therefore determines that this claim is valid under the "special rule."

**C.    L.Gi.**

Three trips, June 15, 2005, November 23, 2005, and February 15, 2006 are at issue here, and the plaintiff again invokes the "special rule." (Docket No. 25 at 2.) Each run report associated with these trips mentions that the trip was for dialysis treatment. (A.R. at 483-488.) And the plaintiff once again points out that AdvanceMed used denial code #6 to deny these claims. (A.R. at 296.) Also, the plaintiff points to (timely) PCSs dated May 3, 2005, October 18, 2005, and February 8, 2006, all of which attest to L.Gi's inability to get up from bed without assistance, her inability to ambulate and the medical necessity of ambulance transport. (A.R. at 489-93.)

In response, the defendants find fault, again, with the fact that a different destination is listed on the PCSs than the destination indicated on the run report and that, on two of the PCSs, it is not entirely clear who the doctor who signed the PCS was. (Docket No. 26 at 9.) There is no doubt these PCSs could have been filled out in more detail by L.Gi's doctors. However, there

8

is no suggestion that the PCSs are fraudulent or were not signed by L. Gi's doctors, and the PCSs are still orders, signed by physicians, attesting to the medical necessity of ambulance transport, as required under the "special rule." As above, there is nothing in the record to counsel against the eminently logical conclusion that these trips were "scheduled and repetitive." Therefore, these claims are valid under the "special rule."

**D.    K.G.**

Four ambulance trips (January 25, 2005, February 28, 2005, December 5, 2005, and March 20, 2006) are at issue here, and, once again, the plaintiff invokes the "special rule." (Docket No. 25 at 2.) The grounds are the same: the run reports indicate that K.G. was a dialysis patient (A.R. at 517-522), "denial code #6" was used to deny the claims (A.R.at 296-297), and there are timely, signed PCSs attesting to the medical necessity of ambulance transport (in light of K.G's paraplegia and "end stage renal disease") dated December 7, 2004, February 1, 2005, October 25, 2005, and February 2, 2006. (A.R. at 514, 527-28, and 534.)

The defendants' challenges to the "special rule" claim are weak here. They note that the "date of service" indicated on one PCS is unclear and that another PCS "lacked any information on K.G.'s physician," although there can be no dispute that all four PCSs are signed, and there is nothing to suggest fraud. (Docket No. 26 at 10-11.) As above, these objections do not challenge the basic substantive point – the plaintiff obtained a signed statement of medical necessity for each transport at issue. Given the other evidence showing that the transports were "scheduled and repetitive," the court concludes that these claims are covered by the "special rule."

**E.    C.L.**

9

This claim concerns a June 7, 2006 trip, and the plaintiff invokes the "special rule." (Docket No. 25 at 2.) In addition to the "denial code" evidence, the case that C.L's transport was "scheduled and repetitive" is particularly strong here, as the run report states that the trip was for C.L.'s "weekly dialysis." (A.R. at 654.) The problem here, however, is that the only PCS the plaintiff can provide is dated June 8, 2006, one day after the trip. (A.R. at 660.) Under the plain language of the special rule, the PCS offered is not valid for this trip. Therefore, the only apparent basis for coverage is under the general rule, which requires a showing that all other means of transport are contraindicated. 42 C.F.R. 410.40(d)(1).

The court has little difficulty concluding that the MAC's opinion – which denied the plaintiff's claim – was not supported by substantial evidence. (A.R. at 21-22.) The PCS, signed one day after the transport at issue, states that C.L. was bed confined and unable to sit in a chair or wheelchair for the duration of the trip without risk of pain or further injury. (A.R. at 660.) Additionally, the run report indicates that C.L suffered from end stage renal disease and required a stretcher due to that condition. (A.R. at 654-55.) Also, on the ride to the care clinic, C.L. complained of "severe pain" in his right ribs whenever he breathed. (A.R. at 654.) While the defendants are correct that the run report also indicates that, on the return trip, C.L. was able to sit and even walk with assistance, the court still has no difficulty, in light of the run report and the PCS, which documented the patient's fragile state, concluding that all other forms of transport were contraindicated.[2] Therefore, the court concludes that the MAC's decision on this

---

[2]In the absence of expert testimony, further evidence, or even much case law interpreting these regulations, the court is, as a few other courts have been, left to use its common sense and general understanding to evaluate whether an ambulance was the only viable form of transport,

claim was not supported by substantial evidence.

### F. G.P.

This claim concerns a September 15, 2006 trip, and the plaintiff invokes the "special rule." (Docket No. 25 at 2.) It is clear from the Administrative Record that the treatment at issue was "scheduled and repetitive," as the record contains an April 26, 2006 "to whom it may concern" letter from G.P.'s nurse, stating that G.P. receives dialysis three times a week. (A.R. at 728.) Moreover, there is a (timely) August 23, 2006 signed PCS stating that G.P. cannot get up from bed without assistance and has end stage renal disease. (A.R. at 725.)

The defendants' only challenge here is that the PCS states that the "dates of service" for the PCS are August 16, 2006 to October 16, 2006, but the PCS was not signed until August 23, 2006, after its "dates of service" began. (A.R. at 725; Docket No. 26 at 12.) It should be clear from the discussion above that the court finds these types of objections irrelevant to the applicability of the special rule. There is a timely, signed PCS and clear evidence that the service was "scheduled and repetitive." Therefore, this claim is covered by the "special rule."

### G. R.C.

This claim involves an April 20, 2005 trip for a follow-up evaluation of R.C.'s right wrist injury, and the plaintiff challenges the MAC's decision under the general rule. (Docket No. 25

---

with an eye toward the patient's general medical condition and whether the patient risked further injury if he or she did not travel by ambulance. *See Am. Ambulance Serv. of Pa. v. Sullivan.*, 761 F. Supp. 1211, 1218 (E.D. Pa. 1991). The court's basic understanding from the record and briefing is that an ambulance provides a heightened level of safety and security for the patient, but that security comes at a significant additional cost for the defendants. The court therefore is weighing the benefits and the costs when it assesses the MAC's application of the general rule.

at 4; A.R. at 418.) The run report indicates that R.C. had schizophrenia and dementia, among other conditions. (A.R. at 418.) R.C. was apparently in no distress during the trip, and the trip was largely uneventful. (*Id.*) There is a PCS, dated April 26, 2005, stating that ambulance transport is medically necessary, but also stating that R.C. did not meet the conditions for bed confinement. (A.R. at 420.)

During the administrative review process, the ALJ determined that the trip was covered, and the MAC reversed this decision. (A.R. at 12-13.) In somewhat conclusory fashion, the MAC determined that, "despite the beneficiary's medical history, the evidence in the record did not demonstrate that other means of transportation were contraindicated," particularly given R.C.'s stable condition and lack of complications during transport. (A.R. at 13.)

The court concludes that the MAC's decision was supported by substantial evidence. The trip at issue was to address a relatively minor medical problem, and there is no indication that the patient was in any distress such that an ambulance would be required. While the patient may have suffered from mental illness, there is no suggestion that this illness manifested itself (or threatened to manifest itself) in a way that would necessitate the use of an ambulance over another form of transport, such as a wheelchair van. While the PCS does state that an ambulance is medically necessary, as noted above, under the general rule, the MAC is not required to accept this as "gospel" and may consider the entire record. Considering that record, the court concludes that there is substantial evidence to support the MAC's conclusion. Therefore, the court affirms the MAC's decision as to this claim.

### H. L.D.

This claim concerns a July 11, 2005 trip for a chest x-ray on L.D, and the plaintiff challenges the MAC's finding under the general rule. (Docket No. 25 at 4; A.R. at 431.) The run report for the trip states that, when the plaintiff's employees arrived to take L.D. to his appointment, he was "laying in chair," awake but not responsive. (A.R. at 431.) He was then taken by stretcher to and from his appointment. (*Id*.) A PCS, signed July 11, 2005, states that L.D. is bed-confined, cannot sit for the duration of the trip without pain, and ambulance transport is medically necessary. (A.R. at 442.)

The ALJ found this transport to be covered by Medicare, but the MAC disagreed. (A.R. at 13.) In the March 4, 2011 Memorandum and Order, the court cited L.D.'s case as one of the reasons that the court had "serious concerns" about the MAC's decision. (Docket No. 24 at 7-8.) The court's analysis is unchanged. In suggesting that L.D. could sit in a chair and was alert, the MAC's opinion on this claim simply misreads the run report, and the conclusion that another method of transport here (besides ambulance) was appropriate is not supported by substantial evidence. Indeed, there is every indication, as discussed in the March 4, 2011 Memorandum, that L.D., given his bed confinement and weak state, required the safety and security of an ambulance. Therefore, the court finds that the MAC's analysis of this claim was not supported by substantial evidence.

### I.   L. Ga.

This claim concerns a September 12, 2005 ambulance trip for a follow-up appointment on L. Ga's fractured hip, and the plaintiff challenges the MAC's decision under the "general rule." (Docket No. 25 at 4.) The run report indicates that L. Ga was a 96-year-old woman with a

variety of end-stage illnesses, and a stretcher was required to take her to and from the ambulance due to "muscle disuse." (A.R. at 466.) The report further indicates that vitals on L. Ga could not be obtained during the trip because L. Ga was "combative." (*Id*.) Among others, there is an August 13, 2005 PCS in the record stating that an ambulance is medically necessary in light of the fact that, while L.Ga could sit, she could not do so for the duration of the trip without pain, could not ambulate or get out of bed without assistance, and was recovering from a total hip replacement. (A.R. at 470.)

The ALJ determined that this ambulance trip was covered by Medicare, and the MAC disagreed, focusing on the fact that, as indicated on the PCS, L. Ga could sit in a wheelchair and was, therefore, not bed-confined. (A.R. at 16.) The MAC noted that L. Ga was "combative" during the trip but concluded that "the documentation fails to support that the beneficiary's condition precluded transport by wheelchair van or that her health would be jeopardized if she were not transported by ambulance." (A.R. at 16.)

The court finds that this conclusion is not supported by substantial evidence. This was a 96-year-old woman with a myriad of conditions, including a mending fractured hip, from whom vital signs could not be taken because she was too combative when approached. As noted above, "bed confinement" is only one factor in "medical necessity" determinations under the general rule. Here, given L. Ga's age, conditions, and inability to refrain from fighting with her transporters, the court is convinced that all other less intensive means of transport are

contraindicated by the record.[3] That is, the safety and security of an ambulance was required. Therefore, the MAC's decision on this claim was not supported by substantial evidence.

**J.      B.H.**

This claim involves a June 7, 2005 ambulance trip for a chest x-ray on B.H., and the plaintiff challenges the MAC's analysis under the "general rule." (Docket No. 25 at 4.) A June 7, 2005 PCS for B.H states that ambulance transport is medically necessary as, among other things, B.H. was bed-confined, "schizo" and had "senile delirium." (A.R. at 579.) The run report describes the plaintiff's representatives loading B.H. from her bed to a stretcher and then to an ambulance and states that the stretcher was required due to decreased "LOC" (unclear) and B.H.'s "morbid obesity." (A.R. at 576.) The run report states that B.H. had "no complaints" and that the trip was uneventful. (*Id.*)

The MAC reversed the ALJ's finding that the ride was covered. (A.R. at 18.) The MAC focused on the fact that, given B.H.'s relative stability, even though she was bed-confined, there is no suggestion from the record that she should not have been transferred via wheelchair van or other less intensive conveyance. (*Id.*)

Although it is close, the court concludes that this finding is supported by substantial evidence. While B.H. does appear to have been bed-confined, as noted above, bed confinement

---

[3]With this case, and with the case of L.J. (discussed below), the court finds the MAC's hindsight bias to be particularly unreasonable. Where there is a history of combative behavior, it is most unfair to deny the plaintiff's claim for reimbursement essentially because, in the end, the ride was relatively uneventful. Indeed, it does not require a great leap of logic to conclude that, with a combative patient, perhaps the ride was relatively uneventful because the patient was transported using the safety and security of an ambulance.

is not the sole test. There is little suggestion from the record that B.H.s condition on the day of transport was such that she actually required an ambulance. That is, there is no suggestion that she was in any acute distress or that her mental illnesses precluded any form of transportation that did not provide the support that an ambulance would. Therefore, the court affirms the MAC's decision with regard to this claim.

### K. M.H.

This claim concerns a September 20, 2005 ambulance trip for an x-ray on M.H.'s arm, and the plaintiff challenges the MAC's analysis under the "general rule." (Docket No. 25 at 4.) The PCS for this trip states that ambulance transport is medically necessary in light of the fact that M.H. could not get up from bed without assistance, could not ambulate, and could not sit for the duration of transport without pain. (A.R. at 595.) The PCS also states that M.H. suffered from "senile delusion" and osteoporosis. (*Id*.) The run report describes that, when M.H. was picked up for the trip, she was sitting in a wheelchair, was moved to the ambulance, and the ride was uneventful. (A.R. at 593.)

The MAC again reversed the ALJ's finding that the ride was covered, finding that the record indicated that M.H. was stable throughout the trip and, therefore, could have been transferred by less intensive means. (A.R. at 19-20.) The court, upon reviewing the record, finds that this conclusion is supported by substantial evidence. Again, there is little suggestion from the record that M.H's specific condition created a situation in which the enhanced safety and security of an ambulance was required. Therefore, the court affirms the MAC's conclusion as to this claim.

### L. L.J.

This claim concerns a November 18, 2005 ride, and the plaintiff challenges the MAC's decision under the "general rule." (Docket No. 25 at 4.) The run report states that L.J. had dementia and was senile, and a stretcher was required because of L.J.'s "altered mental status." (A.R. at 610.) Otherwise, the run report describes an unremarkable trip. (*Id*.) The signed PCS for the trip states that an ambulance (with its restraining devices) was required for transport due to L.J.'s "history of combative behavior," and the record further indicates that L.J. was 89 at the time and had been admitted to a psychiatric hospital just 11 days earlier with a "poor" long-term prognosis. (A.R. at 612-18.)

In reversing the ALJ's finding that the ride was covered, the MAC focused entirely on the fact that the ride happened to be uneventful and ignored all the concerns found in the record regarding L.J.'s mental health. (A.R. at 20.) The court finds that the conclusion that an ambulance ride here was not "medically necessary" is not supported by "substantial evidence." In so doing, the court notes L.J.'s recent admission to a psychiatric care facility and the fact that her history of combative behavior was specifically alluded to. While the ride was ultimately uneventful, it is clear from the record that L.J. had considerable psychiatric problems at the time of her transport and that the safety and security provided by an ambulance was necessary. Therefore, the court concludes that the MAC's finding on this claim was not supported by substantial evidence.

### M. C.O.

This claim concerns a July 14, 2006 trip for C.O.'s dialysis treatment, and the plaintiff

challenges the MAC's decision under the "general rule."[4] The PCS asserts that C.O. can ambulate and sit but also states that an ambulance is medically necessary due to a decrease in function caused by end stage renal disease and dementia. (A.R. at 711.) Additionally, another undated doctor's note states that C.O. may not put any pressure on her right heel and that she is on oxygen therapy, which further necessitates an ambulance. (Id. at 712.) The run report describes a largely uneventful trip in which C.O. was moved by EMTs to and from a chair and onto a stretcher. (A.R. at 708-709.)

The ALJ found the claim covered, and the MAC reversed, again focusing on the stability of C.O. during the trip and the fact that the run report indicated that she was sitting when she was picked up for her trip and that she sat through dialysis. (A.R. at 24.) The court concludes that the MAC's finding is not supported by substantial evidence, because it simply ignores the medical information in the record. There is an explicit doctor's note providing several, seemingly compelling justifications for requiring an ambulance. The note reads, "[C.O] has [] congestive heart failure and chronic renal failure. She goes to kidney dialysis three times per week. [She] also has a large ulcer on her right heel. She is not to bear any weight or put any pressure on her right foot. She is also on oxygen therapy. It is medically necessary for [her] to be transported by ambulance." (A.R. at 712.) To the court, this note shows that, especially given the frequency of C.O.'s trips for dialysis and her fragile mental and physical condition, it was not at all medically advisable for C.O. to travel by any manner other than ambulance. For

---

[4]The court assumes that the plaintiff did not invoke the "special rule" because the PCS is undated. (A.R. at 714.)

instance, an ambulance attendant could ensure that, especially given C.O.'s dementia, her foot and oxygen source were always protected, in a way that the driver of a wheelchair van could not. As the MAC's opinion essentially ignored this evidence and focused only on the end results of the trip, the court cannot conclude that the opinion was supported by substantial evidence.

### N. M.R.

This claim involves a February 20, 2006 trip for an x-ray, and the plaintiff challenges the MAC's decision under the "general rule." (Docket No. 25 at 4; Docket No. 26 at 17; A.R. at 373.) The PCS states that ambulance transport is medically necessary because M.R. cannot get up from bed without assistance, ambulate, or sit for the duration of the trip without pain. (A.R. at 759.) The run report describes an unremarkable trip in which M.R. was able to sit while waiting for the ambulance to arrive and had no complaints during the trip. (A.R. at 756.)

The MAC reversed the ALJ's finding that the claim was covered because of M.R.'s ability to sit and the lack of complications during the trip. (Id. at 26.) This conclusion appears to be supported by substantial evidence. There is little indication from the record that M.R. was in any distress or that, on the day of the transport, there was any specific condition that required the safety and security of an ambulance. Therefore, the court affirms the MAC's ruling on this claim.

### O. Summary

The court finds a considerable number of the MAC's decisions to be either inconsistent with applicable law or unsupported by substantial evidence. The appropriate next step is for the

parties to confer as to how they wish to proceed with this litigation, including whether an interlocutory appeal, settlement discussions, or briefing on the continuing basis for extrapolation is appropriate. Within 20 days of the Order that accompanies this Memorandum, the parties should submit a status report, indicating how they wish to proceed.

An appropriate Order will enter.

_____
ALETA A. TRAUGER
U.S. District Court Judge